FILED
2021 Sep-21  PM 01:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JAMES O'SHEA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:20-cv-01616-KOB** |
| | ) | |
| **OMi HOLDINGS, INC., et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

In nearly every literary context, phantoms are shrouded in mystery: "unseen," "hiding," "secret and strange." Andrew Lloyd Webber, *Angel of Music*, from *The Phantom of the Opera* (The Really Useful Group Ltd. 1986). Although this case concerns phantoms in a different context— phantom stock—Plaintiff James O'Shea alleges secrecy, hiding, and elusive promises by the Defendants.

Defendant OMi Holdings employed the Plaintiff under a contract that included a phantom stock arrangement entitling the Plaintiff to a thirty percent payout for earnings of a portion of the company. Mr. O'Shea wanted an ownership interest in the company, but he claims that the nature of phantom stock was a shrouded mystery to him and that, when pressed, Defendants further masked the truth. In May 2020, Defendants fired Mr. O'Shea and stopped making the phantom stock payments. O'Shea claims that the Defendants' nonpayment is a breach of their employment contract, (doc. 15, Count I), and that Defendants induced him to enter the employment contract by fraudulent misrepresentation, (doc. 15, Count II), and fraudulent suppression, (doc. 15, Count III). Plaintiff also seeks a declaratory judgment that he is entitled to the phantom stock arrangement payments since his firing and a buyout of his portion if the shareholders exit the company. (Doc. 15, Count IV).

Before the court is Defendants OMi Holdings, Inc., Hoist Parts, Inc., Tom Codiana, and

Robert M. Bunnel's Motion to Dismiss Plaintiff's Second Amended Complaint in its entirety. (Doc. 18). Mr. O'Shea responded (doc. 22), and Defendants replied (doc. 25). The motion is ripe for review. For the reasons set forth below, the court **DISMISSES WITH PREJUDICE** Mr. O'Shea's breach of contract (Count I) claim as to Mr. Codiana and Mr. Brunnel because they were not parties to the Agreement; **DISMISSES WITH PREJUDICE** Mr. O'Shea's breach of contract claim as to Defendants OMi Holdings and Hoist, Inc. because of the plain language of the parties' Agreement; **DISMISSES WITH PREJUDICE** Mr. O'Shea's declaratory judgment (Count IV) claim for the same reasons it dismisses the breach of contract claim; and **DISMISSES WITH PREJUDICE** Mr. O'Shea's fraud (Count II) and suppression (Count III) claims because those claims are barred by the statute of limitations.

## I. Legal Standard

Defendants move to dismiss Mr. O'Shea's Second Amended Complaint in its entirety under Federal Rules of Civil Procedure 9 and 12(b)(6). Under Rule 12(b)(6), a defendant may challenge whether a plaintiff has "stated a claim upon which relief can be granted." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

While plaintiffs are not required to provide "detailed factual allegations" in their pleadings, they are required to provide "more than the unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. To be plausible on its face, a claim must contain enough facts to "allow[] the court to draw the reasonable inference that the defendant is liable for

the misconduct alleged." *Id*. In other words, the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

The Supreme Court has identified "two working principles" for district courts to use when considering a motion to dismiss. First, when evaluating a motion to dismiss, although the court must assume the veracity of the well-pleaded factual allegations, it does not have to accept legal conclusions as true. *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

 Second, when evaluating a motion to dismiss, district courts are to draw upon their "judicial experience and common sense" to determine if the complaint states a plausible claim. *Iqbal*, 556 U.S. at 679. The court must be able to "infer more than the mere possibility of misconduct." *Id*. If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claim must be dismissed. *Id.*

Claims for fraud or mistake are subject to a special pleading standard. "In alleging fraud or mistake, a party must state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). A complaint satisfies Rule 9(b) when it states

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and
> (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and
> (3) the content of such statements and the manner in which they misled the plaintiff, and
> (4) what the defendants "obtained as a consequence of the fraud."

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (citations omitted).

Courts usually only consider the complaint and any documents attached to it when considering a motion to dismiss. *Brooks*, 116 F.3d at 1368. But when "a plaintiff refers to a document in its complaint, the document is central to [his] claim, the contents are not in dispute, and the defendant attaches the document to its motion to dismiss," the court may consider the document with the motion to dismiss. *Financial Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir. 1999)); *Brooks*, 116 F.3d at 1368–69.

## II. Facts

Because in deciding a motion to dismiss, the court looks to the face of the complaint, the court sets out the facts as Mr. O'Shea presents them in his Second Amended Complaint.

Defendants OMi Holdings and Hoist Parts, Inc. are in the crane business. They service and install overhead cranes, provide parts for overhead cranes, and inspect, repair, and provide maintenance for overhead cranes. (Doc. 15 at 2–3).

Around 2015, OMi President Tom Codiana and OMi CEO Robert M. Bunnel contacted the Plaintiff about expanding their crane business to the Southeastern United States because he had 30 years of experience in the crane industry and was a "well-known salesman." (Doc. 15 at 4). Defendants approached O'Shea about starting a new location for the business in Birmingham, Alabama—what they called the "Southeast Aftermarket Operation." (*Id.*).

The parties negotiated in late March and early April 2015 over the phone and by e-mail. (Doc. 15 at 4). In these negotiations, Mr. O'Shea raised the issue of ownership in the company as a requirement for his working for Defendants. (*Id.* at 5). At the time, Mr. O'Shea was also

negotiating with another crane company about working with it and buying an ownership interest in the company. (Doc. 15 at 4). Mr. O'Shea told the Defendants he had money to invest in the company and could also purchase stock in the company. (*Id.*).

Defendants told O'Shea they would give him "phantom stock" in the company—which they described as being "the same as, or better, than real stock, because [he] would not have to put up any money." (Doc. 15 at 5). Defendants initially offered him a "phantom stock arrangement" in which Mr. O'Shea would have 25% ownership of the Southeast Aftermarket Operation. (*Id.* at 6).

On March 25, 2015, Mr. Bunnel sent Mr. O'Shea a letter with an employment offer, outlining the advantages of phantom stock. (Doc. 15 at 6). After further negotiations, on March 31, 2015, Defendants sent another letter to Mr. O'Shea memorializing the parties' agreement. (*Id.* at 7). According to Mr. O'Shea, the letter recognized that he was to be paid for his services and that he would also have a 30% ownership interest in the Southeastern Aftermarket Operation through phantom stock. (*Id.*).

Mr. O'Shea had no legal representation for the parties' agreement and had never heard of phantom stock. (Doc. 15 at 14–15). Mr. O'Shea told Defendants he did not know how phantom stock worked and relied upon their representations. (*Id.* at 15).

On April 6, 2015, Mr. O'Shea signed the agreement. (Doc. 15 at 8). Then, Mr. O'Shea formed the Southeastern Aftermarket Operation, which he operated until May 2020. (Doc. 15 at 8). Mr. O'Shea says that Defendants did not tell him that he would lose his interest in the venture if he left the company because phantom stock operates differently than regular stock. (Doc. 15 at

5

8). He also says that he would not have entered the agreement had he known how phantom stock worked. (Doc. 15 at 8).

As agreed, Defendants paid the Plaintiff the distributions of 30% of the earnings before interest, taxes, depreciation, and amortization (EBITDA) of the Southeastern Aftermarket Operation while the Plaintiff was employed. (Doc. 15 at 9). On May 18, 2020, Defendants terminated Mr. O'Shea's employment. (*Id.* at 10). Mr. O'Shea says that he was terminated for pretextual reasons and that he was asked to sign a Release and Settlement Agreement but refused to do so. (*Id.*).

Mr. O'Shea claims that it was not until June 2020 that he began to discover that Defendants "intended to intentionally breach the agreement or that the Defendants committed fraud by misrepresenting the phantom stock arrangement to [him] and suppression by not informing [him] that the phantom stock could disappear or divest." (Doc. 15 at 10–11).

Defendants stopped paying Mr. O'Shea's phantom stock compensation after his firing. (Doc. 15 at 10). Based on this nonpayment, Mr. O'Shea brings four claims against Defendants: breach of contract (Count I), fraud (Count II), suppression (Count III), and declaratory judgment (Count IV).

In addition to the Second Amended Complaint, the court considers letters between the parties dated March 25, 2015, March 31, 2015, and April 6, 2015. (Docs. 18-1, 18-2, 18-3). Mr. O'Shea mentions these letters in his Second Amended Complaint, the letters are central to his claims, the contents are not disputed, and Defendants have attached the letters to their motion to dismiss. The March 25, 2015 letter is the initial offer from Defendants to Mr. O'Shea. (Doc. 18-1). The parties continued to negotiate and came to an agreement, which was memorialized in the

March 31, 2015 Letter. (Doc. 18-2). Mr. O'Shea accepted this agreement by signing a letter on

April 6, 2015, which constitutes the contract between the parties. (Doc. 18-3). The March 25,

2015 Letter states in relevant part:

> As we see it, the advantages of the Phantom Stock arrangement are as follows:
>
> 1. James O'Shea does not have to put any money into the deal. If it crashes and burns (which it won't) James O'Shea walks away and does something else.
>
> 2. James O'Shea distributions are treated as compensation avoiding double taxation.
>
> (Doc. 18-1).

And the April 6, 2015 Letter Agreement (the "Agreement") states in relevant part:

> Your compensation package in this role will include a base salary of $125,000 per year, a Phantom Stock arrangement where you would be entitled to 30% of the Southeast Aftermarket Operation, and a 1% overriding commission on any New Equipment sold in the territory. We will not ask you to share in the initial losses of the new Aftermarket Operation, and after profitability is achieved you will receive 30% of the EBITDA generated by the operation in the form of pre-corporate tax compensation. This distribution, and the new equipment sales override payment will be made quarterly, bi-annually, or annually at your option. In the event of an exit of the company by the shareholders you would be treated the same as the shareholders relative to your piece of the Southeast Aftermarket Operation . . .
>
> . . . In the event your employment with OMi ceases for any reason, this agreement shall terminate.
>
> (Doc. 18-3).[1]

---

[1] In his response to Defendants' motion to dismiss, Mr. O'Shea also attached an email he wrote to Mr. Codiana in which Mr. O'Shea said that he did not know "how the Phantom stock works but [that the parties would] need to define ownership." (Doc. 22-2). Mr. Codiana responded that they could "work out all the details [Mr. O'Shea] brought up." (Doc. 22-3). But the court does not consider this email because Mr. O'Shea did not mention it in his Second Amended Complaint. Nor does the court find that the Plaintiff "unquestionably would have had to offer a copy of the [emails with Codiana] in order to prove [his] case." *See Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1285 (11th Cir. 2007) (quoting *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988)).

### III.   Discussion

Defendants move to dismiss Mr. O'Shea's Second Amended Complaint in its entirety because "the alleged discussions and documents, including the alleged agreement between the parties, plainly stated that (a) Plaintiff was receiving from the Defendants phantom stock and not actual ownership in OMi or Hoist and (b) any compensation under the alleged agreement ended when Plaintiff's employment ended." (Doc. 18 at 1–2).

The court will consider Counts One through Four of Mr. O'Shea's Second Amended Complaint to determine whether any of his claims should be dismissed under Rules 9(b) or 12(b)(6).

### A.   Count One: Breach of Contract

Defendants Tom Codiana and Mike Brunnel move to dismiss Mr. O'Shea's breach of contract claim against them because they were not parties to the April 6, 2015 Agreement. (Doc. 18 at 11). Defendants OMi Holdings, Inc. and Hoist Parts, Inc. move to dismiss Mr. O'Shea's breach of contract claim because his claim is contrary to the plain terms of the parties' agreement. (*Id.* at 12).

To establish breach of contract under Alabama law, a plaintiff must show: "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Southern Medical Health Systems, Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995) (citations omitted). Under Alabama law, a court considers "the circumstances surrounding the contract . . . only where the terms are ambiguous." *Reeves Cedarhurst Development Corp. v. First Amfed Corp.*, 607 So. 2d 184, 187 (Ala. 1992). If the terms are not ambiguous, a court does not consider intentions or the course of

8

dealing between the parties. *Reeves Cedarhurst*, 607 So. 2d at 187. Whether a contract's terms are ambiguous is a question of law for the court. *Id.* at 186 (citation omitted). "In interpreting a contract, the words of the agreement will be given their ordinary meaning." *McLemore v. Hyundai Motor Mfg. Alabama LLC*, 7 So. 3d 318, 327 (Ala. 2008) (internal quotation marks and citation omitted).

### 1. *Mr. O'Shea's Breach of Contract Claim against the Individual Defendants*

Defendants Tom Codiana and Mike Brunnel move to dismiss Mr. O'Shea's breach of contract claim against them because they were not parties to the Agreement. (Doc. 18 at 11). Defendants assert that the Agreement is "in the form of a letter to Plaintiff from Tom Codiana as President of OMI Holdings, Inc. with a carbon copy to Mike Bunnel as CEO of OMi" but that neither individual Defendant was a party to the agreement. (*Id.*).

In response, Mr. O'Shea concedes that the breach of contract claim against Defendants Codiana and Brunnel should be dismissed. (Doc. 22 at 1). Thus, the court DISMISSES WITH PREJUDICE Mr. O'Shea's breach of contract claim against Defendants Codiana and Brunnel.

### 2. *Mr. O'Shea's Breach of Contract Claim against the Corporate Defendants*

Defendants OMi and Hoist move to dismiss Mr. O'Shea's breach of contract claim because "the plain language of the contract provides [his] termination from employment terminates his rights under the contract." (Doc. 18 at 12). The April 26, 2015 Letter Agreement—signed by Mr. O'Shea—states: "In the event your employment with OMi ceases for any reason, this agreement shall terminate." (Doc. 18-3). Defendants argue that this language is clear and unambiguous and that Mr. O'Shea's contentions that 1) he should have received a 30% distribution after his employment was terminated on May 18, 2020 and 2) Defendants

anticipatorily breached the requirement to pay him for his phantom stock if they exit the market or sell their stock both fail. (Doc. 18 at 12–13). Defendants further argue that Mr. O'Shea did not plead facts supporting anticipatory breach. (*Id.* at 13).

In response, Mr. O'Shea argues that the failure to pay the agreed thirty percent for the period *after* his firing constitutes breach of contract. Mr. O'Shea argues that the express words of the Agreement state that he "became the owner of thirty percent . . . of the Southeast Aftermarket Operation . . . upon his acceptance of the Agreement." (Doc. 22 at 6). He states that his rights to receive distributions vested and cannot be taken away by the contract's termination. (*Id.* at 6–7). Mr. O'Shea argues that Defendants rely upon a generic definition of "'phantom stock' not applicable to the specific terms of the Agreement or the representations of the Parties." (*Id.* at 7).

Mr. O'Shea argues that his rights vested "when he became owner of thirty percent (30%) of the [Southeastern Market] Operation." (Doc. 22 at 9). He alleges that he acquired this ownership interest when he entered into the Agreement. (*Id.*). Because his rights vested, he argues, they survived termination of the Agreement. (*Id.*).

Mr. O'Shea also points to the Agreement's reference to "distributions"—a term used for payments to owners—and the Agreement's reference to Mr. O'Shea's "piece of the Southeast Aftermarket Operation." (Docs. 22 at 12; 22-1). Finally, Mr. O'Shea argues that the parties' course of dealings shows that he had a vested ownership interest. (Doc. 22 at 12).

In reply, Defendants argue that plain meaning bars Mr. O'Shea's breach of contract claim. (Doc. 25 at 4). Defendants point out that Mr. O'Shea states in his response that he does not claim to own stock in OMi or Hoist. (*Id.*). Defendants state that Mr. O'Shea claims "some

10

unidentified interest in some portion of OMi's or Hoist's operation." (*Id.*). Defendants assert that the Agreement does not reference an ownership interest or state that Mr. O'Shea's phantom stock arrangement would vest. (*Id.* at 4–5).

Defendants further argue that the Agreement's statement that it would terminate if Mr. O'Shea's employment terminated could "only have one meaning, which is that when [Mr. O'Shea's] employment terminates [Mr. O'Shea's] right to compensation under the Letter Agreement, including under the phantom stock arrangement, also terminates." (Doc. 25 at 5). Defendants state the "plain meaning of 'phantom stock' should suffice for the [c]ourt to determine that [Mr. O'Shea] had no ownership interest" and that parol evidence should not be considered because the contract is unambiguous. (*Id.*).

As to plain meaning, the version of Black's Law Dictionary available in 2015 defined "phantom stock" as "[i]maginary stock that is credited to a corporate executive account as part of the executive's compensation package." *Phantom Stock*, *Black's Law Dictionary* (8th ed. 2004). And in 2015, Investopedia.com defined a phantom stock plan as "an employee benefit that gives selected employees (senior management) many of the benefits of stock ownership without actually giving them any company stock." *Phantom Stock Plan*, Investopedia (April 2015), https://www.investopedia.com/terms/p/phantomstock.asp [https://web.archive.org/web/20150413113711/http://www.investopedia.com/terms/p/phantomstock.asp].

Courts only look to the circumstances surrounding a contract when the contract's terms are ambiguous; whether terms are ambiguous is a question of law. *Reeves Cedarhurst Development Corp. v. First Amfed Corp.*, 607 So. 2d 184, 186–87 (Ala. 1992). When

interpreting contracts, courts are to give words "their ordinary meaning." *McLemore v. Hyundai Motor Mfg. Alabama LLC*, 7 So. 3d 318, 327 (Ala. 2008) (internal quotation marks and citation omitted).

Here, the court finds that the plain language of the April 6, 2015 Agreement unambiguously grants no ownership interest or vested rights to Mr. O'Shea after his firing. This finding centers on the meaning of "phantom stock," so the court turns there first. Dictionary definitions show that the plain meaning of "phantom stock" is "imaginary stock," that conveys to employees a benefit "without actually giving them any company stock." *See Phantom stock*, *Black's Law Dictionary*, *supra*; Hayes, *Phantom Stock Plan*, *supra*. These definitions plainly state that phantom stock conveys no vested rights or ownership interest.

The court notes that the meaning of phantom stock is not shrouded in mystery. These definitions were accessible by a quick Google search or dictionary reference in 2015. Certainly, some unusual phantom stock plans contain provisions specifically stating that ownership rights vest. *See, e.g.*, *Hahn v. National Bank*, 99 F. Supp. 2d 275 (E.D.N.Y. 2000) (noting that "the vesting schedule set forth in the Plan . . . provided for full vesting in the third year following a grant of a Phantom Stock Award"). But the April 6 Agreement in this case lacked any such provisions, leaving only the plain meaning of phantom stock, which does not convey an ownership interest. Thus, Mr. O'Shea's arguments that Defendants employ an overly generic definition of "phantom stock" are unpersuasive. (Doc. 22 at 7).

The plain meaning of phantom stock is also in harmony with the other terms of the Agreement. The Agreement states that "[i]n the event of an exit of the company by the shareholders you would be treated *the same as* the shareholders"—suggesting that Mr. O'Shea is

not, in fact, a shareholder with ownership interest. (Doc. 18-3). The Agreement also provides that Mr. O'Shea's phantom stock payments would occur "in the form of pre-corporate tax *compensation*" and "Aftermarket *compensation*." (*Id.*) (emphases added). Repeated use of the term "compensation" makes clear that Mr. O'Shea's interest in the Southeast Aftermarket Operation was in the form of payments more akin to a bonus or commission, rather than an ownership interest. For the same reason, the Agreement's reference to Mr. O'Shea's "piece" of the company creates no ambiguity because the "piece" is immediately defined in the next sentence as "the Aftermarket compensation piece." (Doc. 18-3). And the terms "owner" and "ownership" are conspicuously absent from the Agreement. The court finds that the plain language of the Agreement unambiguously describes compensation rights, rather than any ownership interest.

Further, the court finds little merit in Mr. O'Shea's arguments that he had a "vested" right that was irrevocable. The case law that Mr. O'Shea cites demonstrates that vested rights are "not contingent; unconditional; absolute." *Sutton v. Sutton*, 217 So. 3d 937, 942 n.6 (Ala. Civ. App. 2016) (Thompson, J., concurring) (quoting *Vested*, *Black's Law Dictionary* (10th ed. 2014)). But the Agreement states that Mr. O'Shea's phantom stock rights shall terminate if his "employment with OMi ceases for any reason." (Doc. 18-3). Mr. O'Shea cannot claim breach of contract for nonpayment *after* his firing when the Agreement expressly terminates upon his firing. Any ownership rights that the Agreement arguably provided could not be vested because they were contingent on his continued employment, rather than "unconditional." *See Sutton*, 217 So. 3d at 942 n.6.

Finally, because the court finds the plain meaning of the contract's terms to be

13

unambiguous, Alabama law prevents the court from considering O'Shea's arguments regarding the course of the parties' dealings. *See Reeves Cedarhurst Development Corp.*, 607 So. 2d at 186–87.

In sum, the Agreement does not mask the truth about phantom stock. The contract unambiguously provides that phantom stock does not convey ownership interest and that Mr. O'Shea's right to payment terminates with his employment. Because this finding relies on the interpretation of undisputed documents identified in the complaint, no amendment to the pleadings could cure the error. Thus, the court DISMISSES WITH PREJUDICE Mr. O'Shea's breach of contract claim against Defendants OMi and Hoist.

B.  Counts Two and Three: Fraud and Suppression

Mr. O'Shea brings two fraud claims in his Second Amended Complaint—one for fraud and another for suppression. Because they are related, the court considers them together. For purposes of clarity, the court will refer to Mr. O'Shea's fraud claim as his "fraudulent misrepresentation" claim and his suppression claim as his "fraudulent suppression" claim.

For his fraudulent misrepresentation claim, Mr. O'Shea avers that Defendants committed fraud because they represented to him that he would receive an ownership interest in the company, that "phantom stock was the same or better than actual stock," and that he would receive distributions if shareholders exited the company. (Doc. 15 at 12–13). He alleges that Defendants made these representations to induce him to enter into the Agreement with Defendants. (*Id.* at 13).

For his fraudulent suppression claim, Mr. O'Shea avers that Defendants suppressed

material facts they were obligated to disclose, i.e., they did not tell him that they did not intend

for him to keep his ownership interest in the company if terminated and did not tell him that

phantom stock did not vest an ownership interest. (Doc. 15 at 14–15).

Defendants argue that Mr. O'Shea has not stated a claim for fraudulent misrepresentation

or for fraudulent suppression. (Doc. 18 at 13). In response, Mr. O'Shea points to the parties'

dealings as representing to Mr. O'Shea that he would have an ownership interest in the new

division. For example, O'Shea made it clear to Defendants that he needed to have an ownership

interest in the company, that he had money to put into the company, and that he would be willing

to purchase stock. Importantly, he also alleges that Defendants told him that "phantom stock"

was "the same as, or better, than real stock." (Doc. 15, at 5). He thus argues that Defendants had

a duty to disclose to Mr. O'Shea that "he would not be an owner since he made it clear that

ownership was a pre-requisite to him even considering employment." (Doc. 22 at 16).

In reply, Defendants state that Mr. O'Shea never alleges that "any of the Defendants used

the terms 'owner' or 'ownership' when negotiating with him" and that he does not "identify the

entity in which he alleges he had ownership." (Doc. 25 at 3).

### 1. *Statute of Limitations*

Actions for fraud fall under Ala. Code § 6-2-38, which has a two-year statute of

limitations. Defendants argue that Mr. O'Shea's fraudulent misrepresentation and fraudulent

suppression claims are barred by the statute of limitations because he did not plead that he filed

his claims within two years of discovering the alleged fraud. (Doc. 18 at 13). Defendants assert

that Mr. O'Shea did not file his lawsuit until October 14, 2020—five years after the alleged

fraudulent statements were made in April 2015—and that he did not plead "even in conclusory

fashion that he failed to discover the fraud within the statute of limitations period." (*Id.* at 14).

Thus, Defendants argue, his discovery of the alleged fraud in June 2020 does not toll the statute

of limitations. (*Id.*).

Defendants argue that Mr. O'Shea knew all the facts that form the basis of the alleged

fraud when he signed the parties' Agreement in April 2015. (*Id.* at 15). Defendants assert that

Mr. O'Shea knew at that time he was being given phantom stock and that all he discovered in

June 2020 is how phantom stock works. (*Id.* at 16). Defendants argue that O'Shea's failure to

learn about phantom stock at the time of the contract was not objectively reasonable because

"[t]he definition and nature of phantom stock is readily available on the internet, and it is

objectively reasonable for Plaintiff to have sought out the definition and legal effect of phantom

stock rather than assuming that it bestowed upon him an ownership interest in the Company."

(*Id.*).

Defendants also argue that to toll the statute of limitations, Mr. O'Shea would

need to plead an affirmative act by Defendants taken to conceal the alleged misrepresentation.

(Doc. 18 at 18).

In response, Mr. O'Shea states that his Second Amended Complaint sufficiently sets forth

his discovery of the fraud in June 2020. (Docs. 22 at 17; 15 at ¶ 37). Mr. O'Shea argues that he

did not discover the fraud until then because he was *vested* with 30% of ownership in the

Southeastern Aftermarket Operation. (Doc. 22 at 18–19) (emphasis added). Mr. O'Shea points to

several cases in which phantom plans allowed for vesting—*Hahn v. National Bank*, 99 F. Supp.

2d 275 (E.D.N.Y. 2000); *Kleve v. Thermo-Right Mfg. Co.*, No. 22205, 2005 WL 418039, at *1

(Ohio Ct. App. Feb. 23, 2005); and *In re Marriage of Faber*, 58 N.E.3d 52 (Ill. App. Ct. 2016).

Mr. O'Shea also argues that he has alleged facts relating to Defendants concealing his cause of action and relating to what prevented him from discovery his injury. (Doc. 22 at 20). Mr. O'Shea points to paragraph 33 of his Second Amended Complaint in which he states that he was

> paid the distributions commensurate with his thirty percent (30%) ownership in the Southeast Aftermarket Operation pursuant to the representations of the Defendants while he was employed, reasonably and foreseeably causing O'Shea to believe that the Defendants' representations about the phantom stock and benefits associated therewith were true and giving O'Shea no indication that the Defendants did not intend to honor their representations about the phantom stock if O'Shea was terminated.

(Docs. 22 at 20; 15 at ¶ 33).

Mr. O'Shea also points to paragraph 37 of his Second Amended Complaint in which he states that in June 2020, after being asked to sign a Release and Settlement Agreement and after the time passed for him to receive distributions, he realized for the first time that "Defendants intended to intentionally breach the agreement or that the Defendants committed fraud by misrepresenting the phantom stock arrangement to the Plaintiff and suppression by not informing the Plaintiff that the phantom stock could disappear or divest." (Docs. 22 at 20–21; 15 at ¶ 37).

In reply, Defendants argue that Mr. O'Shea did not meet the standard for tolling the statute of limitations because he has not shown that June 2020 was when a person of reasonable diligence would have discovered that he had no ownership interest. (Doc. 25 at 8). Defendants argue that Mr. O'Shea has not alleged that Defendants "took some affirmative act to conceal the misrepresentation or suppression to avoid the two-year statute of limitations." (Doc. 25 at 8). Defendants further argue that the cases to which Mr. O'Shea points, in which phantom stock vested, are inapplicable because in each of those cases, the language of the phantom stock

arrangement provided vesting. *See Hahn*, 99 F. Supp. 2d at 280; *Kleve*, 2005 WL 418039, at *1 ("[T]he Agreement also provided that the right to payments would be vested in an employee once that employee had worked for Appellee for seven years. At that time, the right would become vested and could not be stripped away even if the employee was fired for cause or left his employment without good reason."); *In re Marriage of Faber*, 58 N.E.3d at 60 ("The phantom stock did not fully vest upon issuance; it vested over time, consistent with the purpose of the plan being an incentive to work hard and build the shareholder value of the company.").

The court agrees with Defendants that Mr. O'Shea filed his claim after the two-year time bar from the time of the parties' original Agreement. The critical issue, then, is whether Mr. O'Shea's claims fall within the savings provision of Ala. Code § 6-2-3.

Alabama Code § 6-2-3 provides a savings provision for fraud actions; if the statute of limitations creates a bar, "the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action." If a fraud claim was not brought within the statute of limitations, "the burden is on the party bringing the fraud action to show that he comes within the purview of [the savings] provision." *Green v. Wedowee Hosp.*, 584 So. 2d 1309, 1312 (Ala. 1991).

Alabama courts use an "objective standard to determine when a party should have discovered fraud for the purpose of the statute of limitations." *McGowan v. Chrysler Corp.*, 6631 So. 2d 842, 845 (Ala. 1993) (citation omitted). The objective standard asks whether the plaintiff acted in "reasonable reliance" on the defendant's statements. *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997). Under the reasonable reliance standard, "the limitations period

begins to run when the plaintiff was privy to facts which would 'provoke inquiry in the mind of a [person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud.'" *Auto-Owners Ins. Co. v. Abston*, 822 So. 2d 1187, 1195 (Ala. 2001) (quoting *Willcut v. Union Oil Co.*, 432 So. 2d 1217, 1219 (Ala. 1983)).

Mr. O'Shea's alleges that, notwithstanding the Agreement, Defendants communications misled him to believe that he was receiving an ownership interest. This claim implicates another body of case law under the reasonable reliance rule, in which Alabama courts have shown little sympathy to plaintiffs who overlook unambiguous written contract terms in favor of representations to the contrary. Rather, a plaintiff's reliance on a defendant's statements that contradict written contractual terms is *unreasonable* because the plaintiffs "were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms." *Foremost Ins. Co.*, 693 So. 3d at 421; *see Traylor v. Bell*, 518 So. 2d 719 (Ala. 1987); *Alfa Life Ins. Corp. v. Green*, 881 So. 2d 987 (Ala. 2003); *AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200 (Ala. 2008); *see also Mays Mining, Inc. v. Nexgen Extractions, LLC*, No. 6:20-cv-1728-GMB, 2021 WL 2139059 (N.D. Ala. May 26, 2021) (finding that plaintiff unreasonably relied on defendant's oral representations that contract covered profits when document stated that contract covered only revenue). This rule holds true even when plaintiffs lack legal counsel and have little more than a high school education. *See AmerUs Life Ins. Co.*, 5 So.3d at 1209 (collecting cases illustrating this point).

The court finds that the statute of limitations bars both the fraudulent misrepresentation and fraudulent suppression claims because Mr. O'Shea unreasonably relied on Defendants' representations about ownership rights at the time of the Agreement. Mr. O'Shea argues that

Defendants misrepresented an offer of vested ownership interest when they told him that phantom stock was "the same, or better, than real stock." (Doc. 15 at 5). For one thing, this statement by no means promises a vested ownership interest because it does not use those words. But even assuming it did promise ownership, the statement would, at most, *directly contradict* the plain meaning of the written April 6 Agreement. The court has already explained why the April 6 Agreement unambiguously provided Mr. O'Shea no vested rights or ownership interest beyond his termination date because the Agreement provided only phantom stock "compensation," terminating with his employment. (Doc. 18-3). These terms plainly provide Mr. O'Shea no ownership interest and sever his compensation rights at his termination. Because the written contract contradicts the alleged meaning of Defendants' "same-or-better" statement, Mr. O'Shea's reliance on the statements indicates "a deliberate decision to ignore written contract terms." *Foremost Ins. Co.*, 693 So. 3d at 421. This reliance is unreasonable.

Further, Mr. O'Shea does not aver that the Defendants used the terms "owner" or "ownership" with him, and the Agreement does not include either of those terms. The lack of ownership language "would provoke inquiry in the mind" of a reasonably prudent person who was expecting to receive an ownership interest. *See Auto-Owners Ins. Co.*, 822 So. 2d at 1195. Even more troubling is Mr. O'Shea's admission that he "had never heard of phantom stock before [the] [A]greement" and his admission to Defendants during negotiations "that he did not know how phantom stock worked." (Doc. 15 at 8). In other words, Mr. O'Shea relied on Defendants' representations even though he was knowingly—and outspokenly—ignorant about phantom stock. And although Mr. O'Shea lacked an attorney in the negotiations, he still met Alabama's minimal standard for interpreting the Agreement on his own: he could "read and

20

write." *AmerUs Life Ins. Co.*, 5 So. 3d at 1209. Had Mr. O'Shea been reasonably prudent, he would have found out what a phantom stock arrangement is and how it works, rather than "blindly rely" on Defendants. *Id.* at 1208.

The court also notes that Mr. O'Shea had ample opportunity to investigate the meaning of phantom stock. Defendants provided O'Shea with a draft Agreement on March 31—a week before he signed the final April 6 Agreement. (Doc. 18-2). The March 31 draft contained *identical* language as to all the terms at issue here—phantom stock "compensation," Mr. O'Shea's "piece" of the company, his being treated "the same as the shareholders," and the Agreement's termination. Mr. O'Shea clearly negotiated some aspects of this draft (the phantom stock compensation increased from twenty-five to thirty percent between the drafts), but he apparently failed to unmask the meaning of phantom stock in that time. *Compare* (doc. 18-2) *with* (doc. 18-3). His reliance on Defendants' statements alone is unreasonable.

In sum, Mr. O'Shea signed an Agreement providing for phantom stock compensation while he was knowingly ignorant as to what phantom stock was. And although Defendants allegedly stated that phantom stock was "the same, or better" than traditional stock, the Agreement's plain terms contradicted those statements. O'Shea's signing the Agreement in the face of knowing risk is the very kind of "ostrichism" that the reasonable reliance rule intends to root out. *AmerUs Life Ins. Co.*, 5 So. 3d at 1208. Mr. O'Shea was not reasonably prudent in discovering the alleged fraud, so his claim falls outside the savings provision for the statute of limitations. The court DISMISSES WITH PREJUDICE Mr. O'Shea's fraud (Count I) and suppression (Count II) claims as barred by the statute of limitations.

2. *Fraudulent Misrepresentation*

21

Defendants also move to dismiss the fraud claims on substantive grounds. The court has already explained why dismissal is proper on statute of limitations grounds. But in the alternative, dismissal is also proper because Mr. O'Shea fails to state a plausible claim for fraudulent misrepresentation.

Defendants argue that Mr. O'Shea fails to allege facts stating a claim for fraudulent misrepresentation. (Doc. 18 at 19). Mr. O'Shea does not aver that Defendants made any false statements, for example, that he was getting actual stock or that Defendants made false claims about how phantom stock operates. (*Id.* at 19–20). Defendants assert that their statements about phantom stock being better than actual stock are an opinion. (*Id.* at 21). Defendants also assert that their representation regarding what would happen if the shareholders exited the Company did not involve false statements. (*Id.*).

In response, Mr. O'Shea argues that he has never claimed that he would receive actual stock but rather claims that he was promised an ownership interest in the Southeastern Aftermarket Operation. (Doc. 22 at 21). Mr. O'Shea contends that Defendants made statements in the Agreement "promis[ing] him an ownership interest" but "intended the opposite." (*Id.*).

In reply, Defendants argue that Mr. O'Shea cannot establish they made false statements about an ownership right when he has not alleged that Defendants made any such statements and the Letter Agreement provides for phantom stock as part of his compensation and does not mention ownership. (Doc. 25 at 7).

To state a claim for fraud, a plaintiff must show "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation." *Padgett v. Hughes*, 535 So. 2d 140, 142 (Ala.

1988). "[S]tatements of opinion amounting to nothing more than mere 'puffery' or predictions as to events to occur in the future are not statements concerning material facts." *Fincher v. Robinson Bros. Lincoln-Mercury, Inc.* 583 So. 2d 256, 259 (Ala. 1991)

Here, the court finds that Mr. O'Shea fails to state a plausible claim for fraudulent misrepresentation. First, he has not averred facts showing that Defendants made a false statement. The April 6 Agreement provides a phantom stock arrangement that (1) granted Mr. O'Shea compensation at thirty percent of the earnings of the Southeast Aftermarket Operation and (2) promised that O'Shea "would be treated the same as the shareholders relative to [his] piece of the Southeast Aftermarket Operation" if the shareholders exited the company. (Doc. 18-3). The court finds these statements to be true because Defendants provided these benefits while O'Shea was employed. The Agreement also provides for its own termination if O'Shea's "employment with OMI ceases for any reason." (Doc. 18-3). This term proved to be true when Defendants terminated all compensation payments upon O'Shea's firing. Finally, the Agreement refers to Mr. O'Shea's "piece" of the Southeast Aftermarket Operation—a word that O'Shea argues promises an ownership interest. (Doc. 18-3). But the next sentence clarifies that the "piece" is merely an "Aftermarket compensation piece." (Doc. 18-3). The Agreement thus defines Mr. O'Shea's "piece" as a compensation right—not an ownership interest—so the court finds no false representation there.

Nor does the court find false representations in the statements made in negotiations over the Agreement. Mr. O'Shea argues that he was promised an ownership interest through Defendants' statement that phantom stock was "the same, or better" than typical stock. (Doc. 15 at 5). But this statement, which was meant to persuade Mr. O'Shea to join the company during

negotiations, sounds like "puffery" and a "statement of opinion," rather than fraud. *Fincher*, 583 So. 2d at 259. And the statements had merit. After all, O'Shea received a percentage of Defendants' earnings without "hav[ing] to put any money into the deal," and without having to "share in the initial losses." (Doc. 18-1). These benefits arguably make the phantom stock the same or better than traditional stock. Most importantly, however, the statement does not *promise* ownership or vested rights, as it does not use those terms at all.

Finally, even if Defendants arguably promised Mr. O'Shea an ownership interest after his firing, the court has explained in the statute of limitations discussion that those promises were not "reasonably relied upon by the plaintiff." *Padgett*, 535 So. 2d at 142.

The court finds that Mr. O'Shea has failed to state a plausible claim for fraudulent misrepresentation. Thus, as an alternative to dismissal on statute of limitations grounds, the court DISMISSES WITHOUT PREJUDICE Mr. O'Shea's fraudulent misrepresentation claim (Count II).

### 3. *Fraudulent Suppression*

Defendants also challenge the merits of Mr. O'Shea's fraudulent suppression claim. Defendants state that Mr. O'Shea alleges that Defendants "induced [him] into signing the Letter Agreement by failing to inform him that he would 'lose his ownership interest if terminated' . . . and that 'there was no true ownership interest in the phantom stock.'" (Doc. 18 at 22) (citing Doc. 15 at ¶¶ 50–54). Defendants state that Mr. O'Shea "does not allege that [they] fraudulently concealed the nature or legal effect of phantom stock" but only that told him that phantom stock was "better" than actual stock. (*Id.* at 23).

In response, Mr. O'Shea argues that Defendants' argument that no suppression exists is

"based solely upon Defendants' incorrect interpretation of the effect of the Agreement's termination on vested rights and Defendants' wrongful application of a universal meaning they created for the word or phrase 'phantom stock.'" (Doc. 22 at 22).

In reply, Defendants argue that Mr. O'Shea cannot claim that they "suppressed their intention not to pay the phantom stock payments if employment ended when the Letter Agreement provided exactly for" the Agreement to end upon termination. (Doc. 25 at 7).

To state a claim for fraudulent suppression, a plaintiff must show that (1) defendant "had a duty to disclose"; (2) defendant suppressed "an existing, material fact"; defendant "had actual knowledge of the fact and its materiality"; (4) the "lack of knowledge induced [plaintiff] to act"; and (5) "[plaintiff] suffered actual damage as a proximate result." *Hardy v. Blue Cross & Blue Shield of Ala.*, 585 So. 2d 29, 32 (Ala. 1991). For the first element, a duty to disclose arises based on circumstances of the case including "(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances." *Bethel v. Thorn*, 757 So. 2d 1154, 1162 (Ala. 1999).

The court finds that Mr. O'Shea has failed to state a plausible claim for fraudulent concealment because the Agreement is clear about the matters that he alleges Defendants suppressed. Both of the issues raised—whether O'Shea retained an ownership interest post-termination and whether phantom stock vested him with an ownership interest—are unambiguously explained in the Agreement. The court has found that the plain language of the Agreement clearly states that Mr. O'Shea was receiving phantom stock and that the Agreement also clearly states that it would terminate if his employment ceased. Defendants did not suppress

25

either of these facts.

Further, the court finds that Mr. O'Shea has failed to allege that Defendants had a "duty to disclose." *Hardy*, 585 So. 2d at 32. Mr. O'Shea argues that the duty to disclose arose because he told Defendants that he would not "enter into the deal without an ownership interest in the Company." (Doc. 15 at 15). Looking to the circumstances giving rise to a duty to disclose, Defendants certainly knew what phantom stock was, and O'Shea alleges that he did not. But the court has already found that O'Shea had ample "opportunity to ascertain" the definition of phantom stock, which would have indicated no ownership rights. *See Bethel*, 757 So. 2d at 1162. Further, O'Shea has not alleged facts showing a "special relationship of trust or confidence" that would give rise to a duty to disclose, such as an agency or contractual relationship. *See Potter v. First Real Estate Co., Inc.*, 844 So. 2d 540, 543 (Ala. 2002) (finding relationship of trust between plaintiff and his defendant-real estate agent); *Bethel*, 757 So. 2d at 1162. And although O'Shea placed a high value on the fact of ownership during negotiations, he was provided with an unambiguous draft Agreement several days before he signed the April 6 Agreement. That period provided ample time to consult an attorney or to conduct the minimal research needed to unravel the mysteries of phantom stock. The court finds no duty to disclose.

Thus, although the court dismisses Mr. O'Shea's claim on statute of limitations grounds, the court alternatively DISMISSES WITHOUT PREJUDICE his fraudulent concealment claim (Count II) because he fails to plausibly state that claim.

### C.  Count Four: Declaratory Judgment

Defendants lastly argue that Mr. O'Shea's declaratory judgment claim is due to be dismissed for the same reasons the other claims are due to be dismissed. (Doc. 18 at 26).

26

In his Second Amended Complaint, Mr. O'Shea seeks a declaration that Defendants must continue to make payments equal to 30% of the Southeastern Aftermarket Operation and that Defendants must make a payment equal to 30% of the Operation if shareholders exit the Company and also for specific performance. (Doc. 15 at 17). These claims are rooted in Mr. O'Shea's breach of contract and fraud claims, which the court has dismissed with prejudice. Thus, no "case of actual controversy" exists over which the court could declare a judgment. *See* 28 U.S.C. § 2201(a). Mr. O'Shea's declaratory judgment claim is also due to be DISMISSED WITH PREJUDICE.

## IV.    Conclusion

For the reasons stated above, the court **DISMISSES WITH PREJUDICE** Mr. O'Shea's breach of contract (Count I) claim as to Mr. Codiana and Mr. Brunnel because they were not parties to the Agreement; **DISMISSES WITH PREJUDICE** Mr. O'Shea's breach of contract claim as to Defendants OMi Holdings and Hoist, Inc. because of the plain language of the parties' Agreement; **DISMISSES WITH PREJUDICE** Mr. O'Shea's declaratory judgment (Count IV) claim for the same reasons it dismisses the breach of contract claim; and **DISMISSES WITH PREJUDICE** Mr. O'Shea's fraudulent misrepresentation (Count II) and suppression (Count III) claims because those claims are barred by the statute of limitations. If the court had not dismissed the fraud claims on statute of limitations grounds, the court would alternatively **DISMISS WITHOUT PREJUDICE** Mr. O'Shea's fraud claims because he fails to plausibly state those claims.

27

**DONE** and **ORDERED** this 21st day of September, 2021.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE